UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

JEREMY PATRICK JOHNSON,            :
                                   :CIVIL ACTION NO. 3:16-CV-414
          Plaintiff,               :
                                   :(JUDGE CONABOY)
          v.                       :
                                   :
CAROLYN W. COLVIN,                 :
Acting Commissioner of             :
Social Security,                   :
                                   :
          Defendant.               :
                                   :
_____

## MEMORANDUM

Pending before the Court is Plaintiff's appeal from the Commissioner's denial of Supplemental Security Income ("SSI") under Title XIV of the Social Security Act.  (Doc. 1.)  He alleged disability beginning on September 11, 2012.  (R. 21.)  The Administrative Law Judge ("ALJ") who evaluated the claim, Randy Riley, concluded in his November 14, 2014, decision that Plaintiff had the severe impairments of "Learning Disorder, Attention Deficit Hyperactivity Disorder, Anxiety with Agoraphobia, Oppositional Defiant Disorder, and Bipolar Disorder" and the non-severe impairments of Ehlers-Danlos Syndrome and colitis which did not alone or in combination meet or equal the severity of one of the listed impairments.  (R. 21-22.)  He also found that Plaintiff had the residual functional capacity ("RFC") to perform a full range of work with certain nonexertional limitations and that he was capable of performing jobs that existed in significant numbers in the national economy.  (R. 23-27.)  ALJ Riley therefore found Plaintiff

was not disabled from November 5, 2012, through the date of the decision.  (R. 27.)

With this action, Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) the ALJ erroneously rejected the assessment of the examining psychologist; 2) the ALJ erroneously rejected the assessment of the treating physician; 3) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations; and 4) the ALJ failed to make any credibility findings regarding the testimony of Plaintiff's witness.  (Doc. 11 at 3.)  After careful review of the record and the parties' filings, the Court concludes this appeal is properly granted.

## I. Background

### A.   Procedural Background

Plaintiff protectively filed for SSI on November 5, 2012. (R. 19.)  The claim was initially denied on March 28, 2013, and Plaintiff filed a request for a hearing before an ALJ on May 16, 2013.  (*Id.*)

ALJ Riley held a hearing on August 28, 2014, in Harrisburg, Pennsylvania.  (*Id.*)  Plaintiff, who was represented by an attorney, appeared via telephone as did Vocational Expert ("VE") Frances Terry, and a witness, Lisa Marie Johnson.  (R. 31.)  As noted above, the ALJ issued his unfavorable decision on November

2

14, 2014, finding that Plaintiff was not disabled under the Social Security Act during the relevant time period.  (R. 27.)

Plaintiff's request for review of the ALJ's decision was dated January 5, 2015.  (R. 6-11.)  The Appeals Council denied Plaintiff's request for review of the ALJ's decision on February 3, 2016.  (R. 1-5.)  In doing so, the ALJ's decision became the decision of the Acting Commissioner.  (R. 1.)

On March 10, 2016, Plaintiff filed his action in this Court appealing the Acting Commissioner's decision.  (Doc. 1.)  Defendant filed her answer and the Social Security Administration transcript on May 26, 2016.  (Docs. 7, 8.)  Plaintiff filed his supporting brief on August 29, 2016.  (Doc. 11.)  Defendant filed her brief on October 3, 2016.  (Doc. 12.)  Plaintiff filed a reply brief on November 10, 2016.  (Doc. 17.)  Therefore, this matter is fully briefed and ripe for disposition.

**B.  *Factual Background***

Plaintiff was born on March 17, 1992, and was twenty years old on the date the application was filed.  (R. 26.)  Plaintiff has a high school education and does not have past relevant work.  (R. 27.)

**1.  Impairment Evidence**

The relevant time period began on November 5, 2012, when Plaintiff filed his SSI application and ends on November 14, 2014, the date on which ALJ Riley issued his decision.  (R. 27-28.)

Records from outside the period are reviewed for context.  Because Plaintiff's claimed errors relate to his mental health impairments, the following review of evidence focuses on these problems.

On June 12, 2012, Plaintiff's primary care provider, Kendra Davis, M.D., opined that, based on his behavioral problems, Plaintiff was "completely disabled from having or maintaining meaningful living outside the home and would not be able to take care of himself or be responsible for his money.  This is chronic and will b[e] a permanent disability even with better treatment." (R. 260.)  Psychiatric exam on the same date showed that Plaintiff was oriented to time, place, person, and situation, he had poor insight and judgment, and he demonstrated appropriate mood and affect.  (R. 262.)

On August 17, 2012, Plaintiff saw Dr. Davis for a medication check.  (R. 253.)  Dr. Davis recorded the following:

> Onset: gradual.  Severity is moderate-severe.  Quality of life: behaviors create problems at school, behaviors create problems at work and behaviors create problems socially.  It occurs constantly.  The problem is improving.  Context: behaviors persist > 6 months and behaviors began before age 7. Symptom is aggravated by deadlines, distractions, stress and tasks requiring attention to detail.  Relieving factors include behavior therapy, dietary modification and stimulant medications. Associated symptoms include bored easily, difficulty waiting turn, disorganization, distracted easily, emotionally labile, excitability, fidgeting/squirming, frequent careless mistakes, frustrated easily, impulsiveness, inattentiveness, loses/forgets

4

> things, poor self image, restlessness, short
> attention span and talks excessively.
> Pertinent negatives include disregard for
> personal safety and unable to follow
> directions.

(R. 253.)  Dr. Davis listed the following chronic problems: ADHD, impulsive type, anxiety, unspecified, Asperger's disorder, bipolar disorder, chronic diarrhea, depression, developmental delay, Ehlers-Danlos syndrome, environmental allergies, a family history of mental illness, irritable colon syndrome, impulse control disorder, learning disability, oppositional defiant disorder, and tachycardia.  (*Id.*)  Psychiatric examination showed the following: Plaintiff was oriented to time, place, person, and situation; he had poor insight and exhibited poor judgment; he did not demonstrate the appropriate mood or affect.  (R. 255.)

On March 7, 2013, Plaintiff saw Daniel Ratliff, D.O., of the Penn State Hershey Heart and Vascular Institute Program for Adults with Congenital Heart Disease.  (R. 347-48.)  Plaintiff reported occasional chest pain and panic attacks.  (R. 347.)  After reviewing an episode of tachycardia the previous May, Dr. Ratliff noted that Plaintiff was otherwise doing fairly well.  (*Id.*)

On the same day, Stanley E. Schneider, Ed. D., conducted a Psychological Clinical Disability Evaluation examination.  (R. 285-93.)  In the Comments and Observations portion of his report, Dr. Schneider reported the following: Plaintiff's mother told him that Plaintiff was on probation for trespassing and zoophilia; Plaintiff

had noticeable body odor (he had not bathed in four days); he was cooperative and answered questions to the best of his ability; he was coughing and spitting throughout the assessment due to a chronic sinus problem; he reported he was applying for disability because of his severe stomach problems which caused him to constantly be in the bathroom, as well as mental problems, anger problems and ADHD; and both Plaintiff and his mother indicated he has a very low tolerance for stress and "flies off the handle" very quickly.  (R. 286.)

Mental Status examination findings included: his eyes were essentially averted and his presentation was mildly anxious; he cooperated and tolerated the assessment but had to twice leave to go to the bathroom and was spitting and coughing the whole time; his speech was soft with a slow response time and somewhat vague content; his mood was noticably dysphoric and his affect very subdued; his stream of thought reflected a slow rate, low volume, acceptable articulation, and no spontaneity; he answered questions to the best of his ability and he had no language impairment; he admitted to being fearful of heights, hitting himself, a remote suicide attempt, and occasionally wanting to hurt others including his parents; he was able to handle simple abstractions but struggled with higher level ones; he had no significant memory impairment; his attention and concentration were acceptable (he was able to repeat four digits forward and eventually did four digits

6

backward with one error); he had a problem with anger management and temper control; his test judgment and insight were acceptable; and he presented as a reliable informant to the best of his ability.  (R. 289-90.)

Dr. Schneider noted that Plaintiff's mother reported that he had a short fuse, had punched the wall and put holes in the walls, dented the washing machine and backdoor, and historically he beat family pets.  (R. 289.)  She also said she was "scared to death" of her son and the family was afraid of him.  (*Id.*)  When Dr. Schneider asked Plaintiff what he did during the day, Plaintiff said he watched TV and used PlayStation.  (*Id.*)  His mother added that he would go "berserk if he does not win at PlayStation," and would throw the controls, stomp on them, hit the bed, swear, and hit himself.  (*Id.*)

Dr. Schneider diagnosed Plaintiff with impulse control disorder, not otherwise specified (NOS); panic attacks; learning disorder, NOS; and attention deficit disorder, ADD or ADHD.  (*Id.*) He assigned Plaintiff overall a global assessment of functioning ("GAF") score of 57 to 60.  (*Id.*)  He concluded that Plaintiff's prognosis was poor, he was not capable of handling money, he was quickly and easily irritated and angered, he was easily forgetful and frustrated and quickly overwhelmed, he could not shave himself and hated to bathe, he had one friend whom he saw about once a month and had a strained relationship with his parents, his

7

concentration was poor, he angered quickly and easily after ten minutes or so, his persistence was poor and his pace was slow.  (R. 290-91.)

Dr. Schneider also completed a medical source statement questionnaire in which he opined that Plaintiff exhibited no limitation making judgments on simple work-related decisions, but otherwise exhibited a number of moderate to extreme limitations in every other functional area about which the form inquired.  (R. 292.)  Regarding findings which supported his assessments, Dr. Schneider noted that Plaintiff needed constant monitoring and supervision, he was easily overwhelmed, upset and angered, he was avoidant, embarrassed easily related to IBS, Chron's, and colitis, he had frequent panic attacks, and he had problems with anger management and impulse control.  (R. 292.)  Dr. Schneider further opined that Plaintiff could not manage benefits in his own interest if awarded.  (R. 293.)

The Disability Determination Explanation contains a Psychiatric Review Technique ("PRT") and a Mental Residual Functional Capacity Assessment completed on March 21, 2013, by state agency consultant George Ondis, Ph. D.  (R. 83-96.)  He opined that Plaintiff experienced a moderate restriction in his activities of daily living, moderate difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace.  (R. 89.)  Regarding

understanding and memory limitations, Dr. Ondis opined that Plaintiff's

> ability to understand and remember complex or detailed instructions is likely to be somewhat limited due to his psychiatric impairments, however, he would be expected to understand and remember simple, one and two-step instructions.  The claimant can perform simple, routine repetitive work in a stable environment.  The claimant can understand, retain, and follow simple job instructions, i.e., perform one and two-step tasks.

(R. 91.) Regarding sustained concentration and persistence limitations, Dr. Ondis opined that Plaintiff was

> capable of working within a work schedule and at a consistent pace for routine and repetitive work.  The claimant can make simple decisions for routine and repetitive tasks.  The claimant is able to carry out short and simple instructions.  Although likely somewhat limited, the claimant is able to maintain concentration and attention for reasonably extended periods when performing simple and repetitive work.  The claimant would be able to maintain regular attendance and be punctual within reasonable expectations.  The claimant would not require special supervision in order to sustain an ordinary work routine when performing simple and repetitive tasks.  The claimant would be expected to complete a normal week without exacerbation of psychological symptoms when performing routine and repetitive work.

(R. 92.)  Social interaction limitations were assessed as follows:

> Although he is rather socially isolated and has a history of difficulty in the context of social interaction, the claimant has the ability to maintain socially appropriate behavior within reasonable standards and can perform personal care functions needed to maintain an acceptable

9

> level of personal hygiene within reasonable
> expectations.  The claimant has the ability
> to get along with others in the workplace,
> ask simple questions, and accept
> instructions/advice.

(R. 92.)  Dr. Ondis concluded that Plaintiff was moderately limited

in his ability to respond appropriately to changes in the work

setting, further explaining that Plaintiff was

> capable of taking appropriate precautions to
> avoid hazards in the workplace.  Although his
> stress tolerance is likely to be somewhat
> limited, the claimant can function in
> production-oriented jobs that require simple
> decision-making.  Although he may have some
> difficulty adjusting to sudden and unexpected
> changes, the claimant can sustain an ordinary
> routine and adapt to routine changes without
> special supervision.  He is able to
> understand simple instructions and ask
> questions, and is capable of goal-setting and
> planning when performing simple and
> repetitive work.

(R. 92-93.)  After finding that Dr. Schneider's opinion did not

provide insight that would exist from a longitudinal treatment

history and was an overestimate of the severity of Plaintiff's

limitations and Dr. Davis's opinion indicates Plaintiff is

disabled, an issue reserved for the commissioner, Dr. Ondis

concluded that the limitations resulting from Plaintiff's mental

impairments did not preclude him from performing the basic mental

demands of competitive work on a sustained basis.  (R. 93.)

On April 25, 2013, Plaintiff returned to Dr. Davis complaining

of worsening bipolar symptoms.  (R. 476.)  He reported that

functioning was extremely difficult.  (*Id.*)  Dr. Davis recorded

10

that Plaintiff presented

> with anxious/fearful thoughts, compulsive
> thoughts, decreased need for sleep, depressed
> mood, difficulty concentrating, difficulty
> falling asleep, difficulty staying asleep,
> diminished interest or pleasure, easily
> startled, excessive worry, fatigue, feelings
> of guilt, feelings of invulnerability,
> increased energy, increased libido, loss of
> appetite, paranoia, poor judgment, family
> history of depression, family history of
> anxiety, family history of bipolar disorder,
> financial worries, history of depression,
> history of suicidal attempts and social
> isolation.  The bipolar disorder is
> aggravated by conflict or stress, social
> interactions and traumatic memories.  The
> bipolar disorder is associated with
> irritability.

(*Id.*)  Dr. Davis added that Plaintiff had been on multiple

medications and had been refusing to see a psychiatrist and attend

appointments regularly in the preceding few years, but he was ready

to be more serious about getting help.  (*Id.*)  She concluded on

mental examination that Plantiff was oriented to time, place,

person and situation, but he had poor insight, exhibited poor

judgment, and did not demonstrate the appropriate mood or affect.

(R. 479.)  Dr. Davis also noted that Plaintiff's symptoms were not

well controlled by his medications, and his behaviors indicated he

was a risk to himself and others.  (*Id.*)  She decided to try a

trial of Lithium and referred Plaintiff to PHS Psychological

Associates for evaluation and treatment.  (*Id.*)

On May 21, 2013, Plaintiff again saw Dr. Davis who reported

that he was not worse though he stopped all medications except the

Lithium.  (R. 473.)  Plaintiff's mother said he was "maybe a little better" but he had more palpitations.  (*Id.*)  Mental examination showed he was oriented to time, place, person, and situation, he had normal insight and judgment, and he had appropriate mood and affect.  (R. 474.)

Although Plaintiff reported increased temper outbursts and anxiety at his visit with Dr. Davis in June 2013, his mental status exam was the same as in May.  (R. 470-71.)  Dr. Davis planned to increase his Lithium dosage.  (R. 471.)

On July 25, 2013, Plaintiff related that his symptoms were improved and fairly controlled but he continued to report that functioning was very difficult.  (R. 467.)  His mother confirmed that his symptoms were less severe, he calmed more readily, and he was also very happy about meeting an on-line girlfriend.  (R. 467.) Dr. Davis noted that Plaintiff went to the bathroom four times while in the office and his body odor was significant and severe. (R. 467-68.)  His mental status examination was the same as in May and June.  (R. 468.)

On August 19, 2013, Plaintiff again reported that his symptoms were poorly controlled and were worsening.  (R. 464.)  He presented with

> anxious/fearful thoughts, compulsive
> thoughts, depressed mood, difficulty
> concentrating, difficulty falling asleep,
> difficulty staying asleep, diminished
> interest or pleasure, easily startled,
> excessive worry, fatigue, feelings of guilt,

12

> increased energy, hallucinations (visual,
> auditory), increased libido, paranoia, poor
> judgment, racing thoughts and restlessness
> but denie[d] loss of appetite or thoughts of
> death or suicide.

(R. 464.)  Plaintiff also reported hearing voices he couldn't understand, seeing things in the dark or out of the corner of his eye, and having angry outbursts like hitting the dog and fighting with his parents.  (*Id.*)  He said he had chronic abdominal pain and diarrhea for which he agreed to a gastrointestinal consultation. (*Id.*)  Mental examination showed that Plaintiff was oriented to time, place, person, and situation but he had poor insight and judgment, he did not demonstrate appropriate mood and affect, and he was irritable.  (R. 465.)  Dr. Davis added Abilify and Atenolol to Plaintiff's medication regimen.  (R. 466.)

At his September visit with Dr. Davis, Plaintiff reported that he did not start Abilify because he heard "horror stories" about its side effects.  (R. 461.)  He expressed a willingness to take something in its place.  (*Id.*)  Plantiff had a normal mental status exam and Dr. Davis added Buspirone to his medication regimen.  (R. 462.)

In November 2013, Dr. Davis noted that Plaintiff was anxious and panicky at times and depressed and irritable at times but he was not breaking things like he had been and was in a better mood when his fiancé was around.  (R. 457.)  His mental status examination was normal.  (R. 459.)

13

At his January 31, 2014, visit, Dr. Davis noted that
Plaintiff's symptoms were poorly controlled and there was a
worsening of previously reported symptoms.  (R. 453.)  She noted
that he presented with anxious/fearful thoughts, compulsive
thoughts, depressed mood, difficulty concentrating, difficulty
falling and staying asleep, diminished interest or pleasure,
excessive worry, paranoia, poor judgment, racing thoughts and
thoughts of death or suicide.  (*Id.*)  Dr. Davis added that
Plaintiff had an overwhelming fear of death and what would happen
if his parents die and he was panicky about it almost constantly.
(R. 453.)  He expressed a fear of pills but was willing to take
something to help with his anxiety.  (*Id.*)  Dr. Davis also recorded
that Plaintiff had almost constant fecal urgency and occasional
incontinence but he was afraid to go for a GI consultation due to
his history of abuse and an unwillingness to have a rectal exam.
(*Id.*)  Dr. Davis noted that Plaintiff's overall appearance was
depressed with poor hygeine.  (R. 454.)  She also found that he was
oriented to time, place, person, and situation, he had normal
insight and judgment, and he demonstrated appropriate mood and
affect.  (R. 455.)  She assessed his generalized anxiety disorder
to be worse and decided to increas the Buspar dosage and add
Alprazolam to his medication regimen.  (*Id.*)

On March 14, 2014, Plaintiff reported worsening symptoms.  (R.
450.)  Dr. Davis noted that Plaintiff's symptoms were unstable and

14

recorded that Plaintiff's panic attacks were so bad that he had
recently need to go to the ER where IV Lorazepam finally helped.
(*Id.*)  She noted that Plaintiff was feeling terrified and felt like
he was going to die--medications helped somewhat but not throughout
the whole day.  (*Id.*)  Dr. Davis found upon physical examination
that Plaintiff's "overall appearance is hyperventilating" but he
was oriented to time, place, person, and situation, he had normal
insight and judgment, and he demonstrated appropriate mood and
affect.  (R. 451-52.)

On May 20, 2014, Dr. Davis again noted that Plaintiff's
anxiety symptoms were poorly controlled.  (R. 447.)  Although
Plaintiff reported that he was not as angry or lashing out, he said
that he was still having panic and was having more and more trouble
leaving the house.  (*Id.*)  Dr. Davis recorded that Plaintiff was
oriented to time, place, person, and situation but he had poor
insight and judgment, and he did not demonstrate the appropriate
mood or affect.  (R. 449.)

In July 2014, Dr. Davis again noted that Plaintiff's anxiety
and depression symptoms were poorly controlled.  (R. 436.)  She
also noted that Plaintiff had chronic offensive body odor, even
after showering, and his hygiene was poor due to mental illness.
(*Id.*)  Plaintiff reported that he felt he could not leave the house
because of the body odor.  (*Id.*)  Upon physical examination Dr.
Davis reported body odor and normal psychiatric findings.  (R. 438-

15

39.)

On August 12, 2014, Dr. Davis completed a pair of questionnaires relating to Plaintiff's functional limitations as the result of his mental and physical impairments. (R. 427, 442.) With respect to Plaintiff's mental limitations, Dr. Davis noted that she had seen Plaintiff every one to three months for eight years. (R. 442.) She indicated that Plaintiff suffers from anxiety with agoraphobia and panic, bipolar disorder, ADHD, intermittent explosive disorder, oppositional defiant disorder, and developmental delay. (*Id.*) She also noted that he had been caught in a sex offense/lewd behavior and animal cruelty. (*Id.*) Dr. Davis assessed a GAF of thirty to thirty-five at best in the preceding year and twenty at the worst. (*Id.*) She stated that Plaintiff's prognosis was poor--he was stable at the time but she did not expect improvement. (*Id.*) She recorded that at the time Plaintiff was taking Alprazolam, Buspar, Atenolol, and a recent trial of Lamictal and side effects from these medications included dizziness, fatigue, and feeling like a zombie. (*Id.*) Dr. Davis opined that as a result of his mental impairments Plaintiff would be precuded from performing most activities listed on the RFC Statement for fifteen percent of an eight-hour workday or more, including the following: remembering locations and work-like procedures; understanding and remembering detailed instructions; carrying out detailed instructions; maintaining attention and

16

concentration for extended periods of time; performing activities within a schedule, maintaining regular attendance, and being punctual and within customary tolerances; sustaining an ordinary routine without special supervision; working in coordination with or in proximity to others without being distracted by them; making simple work-related decisions; completing a normal workweek without interruptions from psychologically based symptoms, and performing at a consistent pace without an unreasonable number and length of rest periods; interacting appropriately with the general public; asking simple questions or requesting assistance; accepting instructions and responding appropriately to criticism from supervisors; getting along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintaining socially appropriate behavior and adhering to basic standards of neatness and cleanliness; responding appropriately to changes in the work setting; being aware of normal hazards and taking appropriate precautions; traveling in unfamiliar places or using public transportation; and setting realistic goals or making plans independently of others.  (R. 443-44.)  Dr. Davis concluded Plaintiff would be off task more than thirty percent of the workday and would be absent from work five or more days per month as a result of his impairments.  (*Id.*)  Compared to an average worker, Dr. Davis expected that Plaintiff efficiently could be expected to perform a job, eight hours a day, five days a week, on a sustained

basis for a continuous period of six months less than fifty percent of the time, and Dr. Davis opined that Plaintiff could not obtain and retain work in a competitive work setting for a continuous period of more than six months.  (*Id.*)  Dr. Davis indicated that her opinions were based on Plaintiffs history and medical file, physical examinations, consultative medical opinions, progress and office notes, laboratory reports and other tests, and psychological evaluations.  (*Id.*)

**2.**   **Hearing Testimony and Function Reports**

**a.**   **Function Reports**

In a Function Report completed on December 23, 2012, Plaintiff indicated that his illnesses affected his ability to work because of pain, bowels, mental problems, and Ehlers-Danlos syndrome.  (R. 202.)  He said he had been sick all his life and he has panic attacks quite a lot.  (R. 203.)  Regarding personal care he reported that he does not bathe a lot, doesn't take care of his hair or shave, and his use of the toilet is "very messy."  (*Id.*) He said his mother reminds him to take care of his personal needs and grooming, and to take his medicine.  (R. 204.)

Plaintiff indicated that he does not go out alone and he does not drive because of panic attacks.  (R. 205.)  He said he watches television a lot and plays video games but he gets quite angry at the games.  (R. 206.)  He has a friend who visits every two months or so and has no other social activities.  (*Id.*)  He added that he

has difficulty getting along with family, friends, and neighbors because of anger problems.  (R. 207.)  Plaintiff also said he does not handle stress well and he hears and sees things.  (R. 208.)

Plaintiff's mother completed a Third Party Function Report indicating that Plaintiff's ability to work is limited by pain, severe sinus disease, constant diarrhea, bad hygiene, Ehlers-Danlos syndrome, panic attacks, depression, and a number of other mental problems.  (R. 191.)  She also said that Plantiff's medicine makes him tired, dizzy and light-headed.  (*Id.*)  Ms. Johnson said she spends all her time with her son and they talk, watch television, and argue.  (*Id.*)

Ms. Johnson indicated that her son has been disabled all his life and his bowels and panic attacks had gotten much worse.  (R. 192.)  Regarding his personal care, she said Plaintiff only changes his clothes about twice a month, bathes about twice a month, refuses to take care of his hair and shave, and has problems using the toilet.  (*Id.*)  She said she asks Plaintiff to take care of personal needs and grooming but the more she complains the longer he will wait to shower.  (R. 193.)  Ms. Johnson also reminds Plaintiff to take his medications and she thinks his memory is getting worse and he forgets a lot.  (*Id.*)  She said he does not get along with others and that he hates everyone, including himself.  (R. 197.)  She also said he does not handle stress at all--he gets angry and cries.  (R. 197.)

**b.    Hearing Testimony**

19

Plaintiff testified via telephone at the August 28, 2014, hearing.  He said he lived with his mother and did no household chores other than take out the trash and he had trouble tying the trash bags.  (R. 33-34.)  He said he had a driver's license but does not drive anymore and he spends his days watching television, playing video games, and napping.  (R. 34-35.)  He testified that he does not see friends or family and is at home with his mother most of the time.  (R. 35.)  Plaintiff said his medications help a little but he has side effects including headaches, fatigue, and light-headedness.  (R. 36.)

Plaintiff explained the difficulties related to his Crohn's colitis, including the need to use the bathroom frequently (ten or more times per day) and accidents with bowel movements if he doesn't take his pills.  (R. 38-39.)  He also testified about his problem with body odor and hygiene--he showers irregularly (once every to or three weeks) and has body odor even after he showers. (R. 38-39.)

Plaintiff said that he really couldn't do much because of his intestinal problems and panic attacks, noting that he thought he was dying from a panic attack a few months earlier.  (R. 39.)

Plaintiff's mother identified the Crohn's disease/colitis and panic issues as her son's main problems.  (R. 40-41.)  She said he had a fear of dying and that the world was ending for all of 2012 and "he went out and did a horrible thing that got him arrested."

20

(R. 41.)  When questioned about why Plaintiff had not had the psychiatric examination ordered by the judge, Plaintiff's mother said she had not been able to arrange one though she tried at numerous facilities.  (R. 42.)  She said that at least twice Plaintiff had agreed to inpatient treatment but by the time he was evaluated he was not suicidal anymore.  (R. 43.)  Ms. Johnson also said that Plaintiff was on the waiting list to be seen at the Stephens Center and was told it would be about three months before he could be seen.  (R. 44.)

Ms. Johnson testified that it was a challenge to get Plaintiff to his visits with Dr. Davis and she has a detailed plan for getting him there and Dr. Davis sees him as soon as he arrives. (R. 45.)  Other than doctor visits, she said Plaintiff does not go more than fifteen feet from the mobile home where they live.  (R. 46.)

Regarding hygiene, Ms. Johnson said it had been about a month since he had taken a bath and, when she tries to encourage him, he doesn't care, he believes "he's here for nothing and he's just going to . . . go to hell.  (R. 47.)  She also said he does not shave himself because he cuts himself so she does it for him when he lets her.  (R. 52-53.)  Regarding anger management, Ms. Johnson said she mostly tries to calm him down, including having him breathe into a paper bag and if that doesn't work, she tries to separate from him and go to her room.  (R. 48.)  She described his

last anger episode where he had a knife and cut holes in a wall and chair--when she said he needed help he agreed but then would not agree to get help.  (R. 48-49.)

Ms. Johnson testified that Plaintiff did not show a good sense of safety and provided examples of putting metal in the microwave, putting pots and pans on a propane stove, and suggesting to get an old coal stove going by throwing gasoline on it.  (R. 50-51.)

Ms. Johnson also explained that she felt her son could not work because of all of his mental and physical problems, including his hygiene issues.  (R. 52.)

The Vocational Expert then testified and was asked by the ALJ to consider a hypothetical person of Plaintiff's age, education, and work experience who was limited to simple, routine, repetitive tasks in a work environment free from fast paced production, involving only simple work-related decisions, with few, if any, workplace changes, no interaction with the public, occasional interaction with co-workers but no tandem tasks, and occasional supervision.  (R. 55-56.)  The VE testified that such an individual could perform jobs such as office cleaner, public conveyance cleaner, and laundry worker.  (R. 56.)  In the sedentary category, the VE identified the jobs of clerical assistant and charge account clerk.  (*Id.*)  The VE testified that if the individual could not engage in the same work activity on a regular and continuing basis for eight hours a day, five days a week, for a forty-hour work

week, there would be no jobs he could do.  (R. 57.)

## 3.   **ALJ Decision**

As noted above, ALJ Riley issued his decision on November 14, 2014.  (R. 19-28.)  ALJ Riley made the following Findings of Fact and Conclusions of Law:

1.   The claimant has not engaged in substantial gainful activity since November 5, 2012, the application date (20 CFR 416-971 et seq.).

2.   The claimant has the following severe impairments: Learning Disorder, Attention Deficit Hyperactivity Disorder, Anxiety with Agoraphobia, Oppositional Defiant Disorder, and Dipolar Disorder (20 CFR 416.920(c)).

3.   The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.920(d), 416.925, and 416.926).

4.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform a full range of work at all exertional levels except that the claimant is limited to the performance of simple, routine, repetitive tasks in a work environment free from fast paced production, involving only simple work-related decision with few, if any, workplace changes.  Additionally, the claimant is unable to interact with the public, engage in more than occasional interaction with coworkers or supervisors, or perform tandem tasks.

5.   The claimant has no past relevant work (20 CFR 416.965).

23

6.   The claimant was born on March 17, 1992 and was 20 years old, which is defined as a younger individual age 18-49, on the date the application was filed ((20 CFR 416.963).

7.   The claimant has at least a high school education and is able to communicate in English (20 CFR 416.964).

8.   Transferability of job skills is not an issue because the claimant does not have past relevant work (20 CFR 416.968).

9.   Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 416.969 and 416.969(a)).

10.  The claimant has not been under a disability, as defined in the Social Security Act, since November 5, 2012, the date the application was filed (20 CFR 416.920(g)).

(R. 21-27.)

ALJ Riley found that the medical evidence did not support the allegations regarding the intensity, persistence, and limiting effects of Plaintiff's impairments.  (R. 24, 26.)  He cited three specific reasons for this conclusion.  (*Id.*)  First, he determined that Plaintiff received little more than medication management from his primary care provider for control of his symptoms despite the seriousness and severity of his complaints and he characterized this care as "the most routine and conservative care."  (*Id.*) Second, ALJ Riley concluded that Plaintiff's primary care

24

provider's records "reveal [his] mental status as generally normal, without evidence of impaired orientation, concentration, judgment, affect, or mood," summarizing that Dr. Davis's "mental status examinations demonstrate the claimant generally retains grossly normal functioning."  (*Id.*)  Third, the ALJ cited inconsistent information given in the record, the medical reports and at the hearing by Plaintiff.  (R. 26.)  Regarding "inconsistent information," ALJ Riley provides the following rationale:

> Though the claimant alleges disability due, in part, to his frequent need for bathroom breaks due to bowel incontinence, the claimant admitted at the hearing that he suffers no bowel incontinence if he remains compliant with his medications (Hearing Testimony), suggesting the claimant's problems are more likely the result of non-compliance with treatment.  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by the claimant may not be entirely reliable.

(R. 26.)

The ALJ assigned great weight to the state agency opinion of Dr. Ondis and assigned little weight to the opinions of Dr. Schneider and Dr. Davis.  (R. 25.)  He concluded that Dr. Schneider based at least some restrictions on Plaintiff's "less-than-credible subjective allegations" and, therefore, ALJ Riley concluded "the entirety of his opinion is suspect."  (*Id.*)  He found that Dr. Davis's opinion appeared to be inconsistent with her "own mental status examinations, generally determining the claimant as

presenting with grossly normal mental status." (*Id.*)   In assigning

great weight to Dr. Ondis's opinion, the ALJ noted that the opinion

did not take into account additional psychological records dated

after the opinion but "the new evidence does not demonstrate a

significant decline in the claimant's longitudinal functioning" and

the opinion was consistent with the other medical evidence of

record.   (R. 25-26.)

## II. Disability Determination Process

The Commissioner is required to use a five-step analysis to

determine whether a claimant is disabled.[1]   It is necessary for the

Commissioner to ascertain: 1) whether the applicant is engaged in a

substantial activity; 2) whether the applicant is severely

impaired; 3) whether the impairment matches or is equal to the

---

[1]   "Disability" is defined as the "inability to engage in any
substantial gainful activity by reason of any medically
determinable physical or mental impairment which can be expected to
result in death or which has lasted or can be expected to last for
a continuous period of not less than 12 months . . . ."  42 U.S.C.
§ 423(d)(1)(A).  The Act further provides that an individual is
disabled

> only if his physical or mental impairment or
> impairments are of such severity that he is not
> only unable to do his previous work but cannot,
> considering his age, education, and work
> experience, engage in any other kind of
> substantial gainful work which exists in the
> national economy, regardless of whether such
> work exists in the immediate area in which he
> lives, or whether a specific job vacancy exists
> for him, or whether he would be hired if he
> applied for work.

42 U.S.C. § 423(d)(2)(A).

requirements of one of the listed impairments, whereby he qualifies for benefits without further inquiry; 4) whether the claimant can perform his past work; 5) whether the claimant's impairment together with his age, education, and past work experiences preclude him from doing any other sort of work.  20 C.F.R. §§ 404.1520(b)-(g), 416.920(b)-(g); *see Sullivan v. Zebley*, 493 U.S. 521, 110 S. Ct. 885, 888-89 (1990).

If the impairments do not meet or equal a listed impairment, the ALJ makes a finding about the claimant's residual functional capacity based on all the relevant medical evidence and other evidence in the case record.  20 C.F.R. § 404.1520(e); 416.920(e). The residual functional capacity assessment is then used at the fourth and fifth steps of the evaluation process.  *Id.*

The disability determination involves shifting burdens of proof.  The initial burden rests with the claimant to demonstrate that he or she is unable to engage in his or her past relevant work.  If the claimant satisfies this burden, then the Commissioner must show that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform.  *Mason v. Shalala*, 993 F.2d 1058, 1064 (3d Cir. 1993).

As set out above, the instant decision was decided at step five of the sequential evaluation process when the ALJ found that Plaintiff could perform jobs which existed in significant numbers in the national economy.  (R. 27.)

### III. Standard of Review

27

This Court's review of the Commissioner's final decision is limited to determining whether there is substantial evidence to support the Commissioner's decision.  42 U.S.C. § 405(g); *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  Substantial evidence means "more than a mere scintilla.  It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see also Cotter v. Harris*, 642 F.2d 700, 704 (3d Cir. 1981).  The Third Circuit Court of Appeals further explained this standard in *Kent v. Schweiker*, 710 F.2d 110 (3d Cir. 1983).

> This oft-cited language is not . . . a talismanic or self-executing formula for adjudication; rather, our decisions make clear that determination of the existence *vel non* of substantial evidence is *not* merely a quantitative exercise.  A single piece of evidence will not satisfy the substantiality test if the Secretary ignores, or fails to resolve, a conflict created by countervailing evidence.  Nor is evidence substantial if it is overwhelmed by other evidence-- particularly certain types of evidence (e.g., that offered by treating physicians)--or if it really constitutes not evidence but mere conclusion.  *See* [*Cotter*, 642 F.2d] at 706 ("'Substantial evidence' can only be considered as supporting evidence in relationship to all the other evidence in the record.") (footnote omitted).  The search for substantial evidence is thus a qualitative exercise without which our review of social security disability cases ceases to be merely deferential and becomes instead a sham.

*Kent*, 710 F.2d at 114.

This guidance makes clear it is necessary for the Secretary to

28

analyze all evidence.  If she has not done so and has not sufficiently explained the weight given to all probative exhibits, "to say that [the] decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational." *Dobrowolsky v. Califano*, 606 F.2d 403, 406 (3d Cir. 1979).  In *Cotter*, the Circuit Court clarified that the ALJ must not only state the evidence considered which supports the result but also indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  However, the ALJ need not undertake an exhaustive discussion of all the evidence.  *See*, *e.g.*, *Knepp v. Apfel*, 204 F.3d 78, 83 (3d Cir. 2000).  "There is no requirement that the ALJ discuss in its opinion every tidbit of evidence included in the record." *Hur v. Barnhart*, 94 F. App'x 130, 133 (3d Cir. 2004).  "[W]here [a reviewing court] can determine that there is substantial evidence supporting the Commissioner's decision, . . . the *Cotter* doctrine is not implicated." *Hernandez v. Comm'f of Soc. Sec.*, 89 Fed. Appx. 771, 774 (3d Cir. 2004) (not precedential).

A reviewing court may not set aside the Commissioner's final

decision if it is supported by substantial evidence, even if the court would have reached different factual conclusions. *Hartranft*, 181 F.3d at 360 (*citing Monsour Medical Center v. Heckler*, 806 F.2d 1185, 1190-91 (3d Cir. 1986); 42 U.S.C. § 405(g) ("[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive . . ."). "However, even if the Secretary's factual findings are supported by substantial evidence, [a court] may review whether the Secretary, in making his findings, applied the correct legal standards to the facts presented." *Friedberg v. Schweiker*, 721 F.2d 445, 447 (3d Cir. 1983) (internal quotation omitted). Where the ALJ's decision is explained in sufficient detail to allow meaningful judicial review and the decision is supported by substantial evidence, a claimed error may be deemed harmless. *See*, *e.g.*, *Albury v. Comm'r of Soc. Sec.*, 116 F. App'x 328, 330 (3d Cir. 2004) (not precedential) (citing *Burnett v. Commissioner*, 220 F.3d 112 (3d Cir. 2000) ("[O]ur primary concern has always been the ability to conduct meaningful judicial review."). An ALJ's decision can only be reviewed by a court based on the evidence that was before the ALJ at the time he or she made his or her decision. *Matthews v. Apfel*, 239 F.3d 589, 593 (3d Cir. 2001).

## IV. Discussion

Plaintiff asserts that the Acting Commissioner's decision should be reversed or remanded for the following reasons: 1) the

ALJ erroneously rejected the assessment of the examining psychologist; 2) the ALJ erroneously rejected the assessment of the treating physician; 3) the ALJ failed to present a hypothetical question containing all of Plaintiff's credibly established limitations; and 4) the ALJ failed to make any credibility findings regarding the testimony of Plaintiff's witness.  (Doc. 11 at 3.)

**A.   *Examining Psychologist's Opinion***

Plaintiff asserts that the ALJ erred in assigning little weight to Dr. Schneider's opinion, an error based on the ALJ's "mistake of fact" that Dr. Schneider's examination findings were normal.  (Doc. 11 at 5-9; Doc. 17 at 1-4.)  Defendant maintains the ALJ reasonably assigned little weight to the opinion. (Doc. 12 at 15-20.)  The Court concludes that remand is required for reconsideration of Dr. Schneider's opinion.

As set out above, it is the ALJ's duty not only to state the evidence considered which supports the result but also to indicate what evidence was rejected: "Since it is apparent that the ALJ cannot reject evidence for no reason or the wrong reason, an explanation from the ALJ of the reason why probative evidence has been rejected is required so that a reviewing court can determine whether the reasons for rejection were improper." *Cotter*, 642 F.2d at 706-07.  A thorough explanation of the evidence relied upon by the ALJ in discounting a medical source opinion takes on added significance in a case involving severe mental impairment in that

31

the Third Circuit has advised that "[t]he principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving mental disability." *Morales v. Apfel*, 225 F.3d 310, 319 (3d Cir. 2000). Furthermore, in the case of mental health impairments, it is recognized that a medical source's opinion which relies on subjective complaints should not necessarily be undermined because psychological and psychiatric conditions are necessarily and largely diagnosed on the basis of a patient's subjective complaints. *Schickel v. Colvin*, No. 14 C 5763, 2015 WL 8481964, at *11 (N.D. Ill. Dec. 10, 2015); *Hall v. Astrue*, 882 F. Supp. 2d 732, 740 (D. Del. 2012).

ALJ Riley set out the following analysis of Dr. Schneider's opinion:

> In March 2013, the claimant presented to Stanley E. Schneider, EdD, for a consultative psychological evaluation. Dr. Schneider confirmed the claimant was not involved with any outpatient mental health treatment and has not been hospitalized for his condition since he was 8 years old. On mental status examination, Dr. Schneider noted that claimant spoke softly and averted his eyes, but demonstrated no significant memory impairment, normal attention and concentration, and acceptable judgment and insight. Dr. Schneider reported the claimant's allegations of difficulty with anger management, sensitivity, and preoccupations, but noted no evidence of any specific social interactive difficulties. He diagnosed the claimant with Impulse Control Disorder, Panic Attacks, Learning Disorder, and ADD, noting the claimant retained a GAF

of 57-60 (Exhibit B4F), consistent with no
more than moderate symptoms or difficulties
in social, occupational, or school
functioning (Diagnostic and Statistical
Manual of Mental Disorders - Fourth Edition
(DSM-IV)).

Thus, while Dr. Schneider reported the
claimant suffered marked-to-extreme
restrictions in his ability to understand,
remember, and carry out even simple
instructions, interact appropriately with
others, and respond appropriately to
workplace changes and pressures, the
undersigned gives the opinion little weight.
The opinion appears based on the claimant's
subjective report of allegations and not the
examiner's own clinical findings or
observations.  Dr. Schneider's opinion that
the claimant suffers marked restrictions in
his ability to understand and remember simple
instructions appears grossly inconsistent
with his clinical examination findings
demonstrating the claimant has normal memory,
attention, and concentration.  Because it is
apparent Dr. Schneider based at least some of
these restrictions on the claimant's less-
than-credible subjective allegations, the
entirety of his opinion is suspect.

(R. 25.)

In ALJ Riley's assessment of Dr. Schneider's opinion, he

recognizes that Dr. Schneider noted that Plaintiff "spoke softly

and averted his eyes" but otherwise cites only normal findings by

Dr. Schneider and attributes difficulties noted in the report to

Plaintiff's subjective reporting.  (R. 25.)  The assessment does

not address many observations clearly made by Dr. Schneider which

can be considered probative evidence supporting Plaintiff's claimed

limitations.  For example, ALJ Riley does not mention that

33

Plaintiff is on probation for charges related to zoophilia,[2] he does not mention the "noticeable body odor" and that Plaintiff had not bathed in four days, and he does not mention that Plaintiff responded and cooperated "to the best of his ability," he does not mention that Plaintiff's speech was "soft with a slow response time, with content somewhat vague," he does not mention that Plaintiff was "noticeably dysphoric," and that his affect was "very subdued," and he does not mention that Plaintiff's stream of thought reflected a slow rate and low volume and there was no spontaneity.  (R. 286, 288-89.)  While ALJ Riley correctly noted that Dr. Schneider reported claimant's allegations regarding his difficulties (R. 25), it is probative that Dr. Schneider noted that Plaintiff was a reliable informant to the best of his ability (R. 290).  It is also noteworthy that Dr. Schneider recorded that Plaintiff struggles to make friends and said "nobody seems to like me or be around me" (R. 288), but the ALJ found that Dr. Schneider "noted no evidence of any specific social interactive difficulties" (R. 25).

Given the amount of probative evidence not discussed by the

---

[2]  Although Defendant points to the fact that the offense predated the relevant time period, citing *McCormick v. Astrue*, No. 08-450, 2010 WL 1740712, at *6 (D. Del. Apr. 30, 2012) for the proposition that "remand not warranted where 'Plaintiff contends that the ALJ erred in failing to consider' certain evidence that preceded date of onset and 'provides no insight into any functional limitations Plaintiff may have had during the relevant time frame,'" Plaintiff remained on probation for the charge during the relevant time period.

ALJ in this case, the Court can only conclude that remand is warranted for a more thorough analysis of Dr. Schneider's opinion which must include consideration of the opinion in the context of other evidence of record, including a full analysis of Dr. Davis's records and the reliability of Plaintiff's subjective complaints, as discussed more fully below.

**B.   *Treating Physician's Opinion***

Plaintiff's second claimed error is that the ALJ failed to assign great weight to the opinion of Dr. Davis, Plaintiff's treating physician, regarding his mental limitations.  (Doc. 11 at 9-15; Doc. 17 at 5-6.)  Defendant contends that the ALJ reasonably assessed Dr. Davis's opinion.  (Doc. 12 at 20.)  The Court concludes that ALJ Riley failed to discuss probative evidence found in Dr. Davis's records and his generalization about the contents of the records is not supported by substantial evidence.  Therefore, the case is also subject to remand for reevaluation of the treating physician's opinion.

As noted above, *Morales* emphasized the importance of proper consideration of medical source opinions in cases involving mental disability, 225 F.3d at 319, setting out the following general framework:

> A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially "when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a

35

> prolonged period of time." *Plummer* [*v.
> Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)]. . .
> . Where, as here, the opinion of a treating
> physician conflicts with that of a non-
> treating, non-examining physician, the ALJ
> may choose whom to credit but "cannot reject
> evidence for no reason or for the wrong
> reason." *Plummer*, 186, F.3d at 429 . . . .
> The ALJ must consider the medical findings
> that support a treating physician's opinion
> that the claimant is disabled. *See Adorno*
> [*v. Shalala*, 40 F.3d 43, 47 (3d Cir. 1994)].
> In choosing to reject the treating
> physician's assessment, an ALJ may not make
> "speculative inferences from medical reports"
> and "may reject a treating physician's
> opinion outright only on the basis of
> contradictory medical evidence" and not due
> to his or her own credibility judgments,
> speculation or lay opinion. *Plummer*, 186
> F.3d at 429; *Frankenfield v. Bowen*, 861 F.2d
> 405, 408 (3d Cir. 1988); *Kent*, 710 F.2d at
> 115.

225 F.3d at 317-18.

The careful consideration of Dr. Davis's opinion is especially

important in that *Morales* recognized that, for a claimant who has a

mental impairment like "an affective or personality disorder marked

by anxiety, the work environment is completely different from home

or a mental health clinic." 225 F.3d at 319. *Morales* directed

that the treating physician's opinion that his patient's "ability

to function is seriously impaired or nonexistent in every area

related to work shall not be supplanted by an inference gleaned

from treatment records reporting on the claimant in an environment

absent of the stress that accompany the work setting." *Id.*

Because bipolar disorder can is episodic, courts have found that an

36

ALJ erred when he found a contradiction between a medical source's statement that a plaintiff's mental illness was severe yet observed that the patient was behaving pretty normally during office visits. *See*, *e.g.*, *Kangail v. Barnhart*, 454 F.3d 627, 628 (7th Cir. 2006).

ALJ Riley gave "little weight" to Dr. Davis's opinion, noting that she determined

> the claimant's cognitive and social
> activities would be precluded for at least
> 10-15 percent of the workday in all 20
> assessed areas except for one (Exhibit B12F).
> She further reported the claimant would be
> off-task for more than 30 percent of any
> given workday and would be absent from work
> at least 5 days per month due to mental
> health complaints (Exhibit B12F).  This
> opinion, dated August 2014, appears
> inconsistent with Dr. Davis's own mental
> status examinations, generally determining
> the claimant as presenting with grossly
> normal mental status.

(R. 25.)

The Court's review of the records from Dr. Davis's long-term treatment of Plaintiff shows that Plaintiff's mental status varied during the relevant time period.  On April 25, 2013, Dr. Davis found that Plaintiff had poor insight, exhibited poor judgment, and he did not demonstrate the appropriate mood or affect.  (R. 479.) Dr. Davis noted that Plaintiff's symptoms were not well controlled by his medications, and his behaviors indicated he was a risk to himself and others.  (*Id.*)  After a few months of normal mental status examinations and reported improvement (R. 467-68, 470-71, 473-74), on August 19, 2013, Plaintiff's symptoms were again

reported to be poorly controlled and worsening (R. 464).  At that time, Plaintiff reported hearing voices he couldn't understand, seeing things in the dark or out of the corner of his eye, and having angry outbursts like hitting the dog and fighting with his parents.  (*Id.*)  Mental examination showed that Plaintiff had poor insight and judgment, he did not demonstrate appropriate mood and affect, and he was irritable.  (R. 465.)  Plaintiff had normal mental status examinations in September and November 2013, though in January 2014, Dr. Davis again noted that Plaintiff's symptoms were worsening and poorly controlled (R. 453).  At the January visit, Dr. Davis reported that Plaintiff's overall appearance was depressed and he had poor hygiene.  (R. 454.)  She concluded that Plaintiff's generalized anxiety disorder was worse.  (*Id.*)  Despite these recorded problems, Dr. Davis assessed a normal mental status exam.  (*Id.*)  In March 2014, Dr. Davis reported that Plaintiff was feeling terrified and had recently gone to the ER because of a severe panic attack.  (R. 450.)  She also recorded that his "overall appearance was hyperventilating" though his mental status exam was normal.  (R. 451-52.)  In May 2014, Dr. Davis recorded that Plaintiff's anxiety symptoms were poorly controlled, and she found that he had poor insight and judgment and he did not demonstrate the appropriate mood or affect.  (R. 449.)  In July, Dr. Davis again noted that Plaintiff's anxiety and depression symptoms were poorly controlled and she reported body odor but

recorded normal mental status exam findings.   (R. 436, 438-39.)

This summary of office notes indicates that Dr. Davis did *not* generally determine that Plaintiff presented with "grossly normal mental status" (R. 25).   The summary also shows that the ALJ failed to apply, or erred in his application of, relevant legal standards in a number of ways.   The ALJ failed to discuss probative evidence found in Dr. Davis's records in his RFC analysis and discussion of Dr. Davis's opinion (*see* R. 23-26).   *Cotter*, 642 F.2d at 706-07. Given the varied recorded findings in the office visit records and the many observed mental health problems documented by Dr. Davis during the relevant time period, ALJ Riley's summation of information in Dr. Davis's office notes appears to be his lay opinion of Dr. Davis's findings--Dr. Davis herself did not regularly find that Plaintiff presented with "grossly normal mental status" and no other medical source reviewed or commented on Dr. Davis's records during the relevant time period.   *Morales*, 225 F.3d at 318.   Furthermore, the ALJ's conclusory statement regarding Dr. Davis's mental status examination findings, unsupported by specific citation to any of Dr. Davis's office records, shows that the ALJ did not fulfill his obligation to explain a basis for conclusions reached.   *See*, *e.g.*, *Gross v. Comm'r of Soc. Sec.*, 653 F. App'x 116, 121-22 (3d Cir. 2016) (not precedential).   Importantly, in affording limited weight to Dr. Davis's opinion, the ALJ cites no contradictory medical evidence (*see* R. 25), an important

39

consideration in that a treating physician opinion is generally entitled to controlling weight if it is well-supported and "not inconsistent with the other substantial evidence" in the case record.[3]  20 C.F.R. § 404.1527(c)(2).

Defendant's argument in support of the ALJ's review (Doc. 12 at 21-23) does not persuade the Court that ALJ Riley's reasons for discounting Dr. Davis's opinion are supported by substantial evidence.  As a threshold matter, Defendant cannot provide *post hoc* reasons for supporting the ALJ's decision.  It is the ALJ's responsibility to explicitly provide reasons for his decision; analysis later provided by Defendant cannot make up for the analysis lacking in the ALJ's decision.  *Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *Dobrowolsky*, 606 F.2d at 406-07.

Furthermore, the reasons cited by Defendant do not provide the suggested support.  First, Defendant's citation to evidence showing that Plaintiff periodically improved with medication does not provide a basis to undermine Dr. Davis's opinion--*Morales* specifically rejected a similar reason for discounting the treating physician's opinion, emphasizing that "[t]he relevant inquiry . . .

---

[3]  Although ALJ Riley said that he gave "little weight" to Dr. Davis's opinion, he essentially rejected the opinion.  (R. 26.)  He did not do so on the basis of "contradictory medical evidence" as required under Third Circuit caselaw.  *Morales*, 225 F.3d at 318; *Plummer*, 186 F.3d at 429; *Frankenfield*, 861 F.2d at 408; *Kent*, 710 F.2d at 115.

is whether the claimant's condition prevents him from engaging in substantial gainful activity."  225 F.3d at 319.

Second, Defendant's reference to a contradiction between Dr. Davis's treatment notes and the "extreme mental limitations she alleged" in her opinion (Doc. 12 at 22) suffers from the same problems as the ALJ's review.  As discussed above, the Court found that ALJ Riley failed to discuss probative evidence which could be considered supportive of Dr. Davis's opinion.  Similarly, Defendant focuses on the portions of the examination reports that support the ALJ's determination (Doc. 12 at 21-22), an improper cherry-picking of Dr. Davis's records.[4]  *See Morales*, 225 F.3d at 318.

Third, Defendant's cited inconsistency between "Dr. Davis's extreme opinion" and Dr. Ondis's assessment to which the ALJ afforded great weight does nothing to save the ALJ's deficient analysis of Dr. Davis's opinion.  The Court finds the ALJ's reliance on the non-examining source opinion problematic for two main reasons: Dr. Ondis did not review any of Dr. Davis's records during the relevant time period; and, contrary to the ALJ's determination (R. 26), Dr. Ondis arrived at some conclusions which

---

[4]  To the extent Dr. Davis occasionally recorded "normal" status findings at the same time as she reported observed mental health problems (*see* R. 436, 438-39, 451-52), clarification from the source or other further development of the record, rather than reliance on questionable inference, may be warranted if the ALJ finds contradiction within the office notes.  *See Johnson v. Comm'r of Soc. Sec.*, 529 F.3d 198, 205 (3d Cir. 2008) (citing 20 C.F.R. § 416.912(e)(1) and 20 C.F.R. § 404.1512(e)(1)); *see also* 20 C.F.R. § 404.1520b.

are contradictory to the medical evidence (*see* R. 86-92).  The ALJ dismissed the lack of consideration of relevant evidence on the basis that the later records did "not demonstrate a significant decline in the claimant's longitudinal functioning."  (R. 26.) Given Plaintiff's many problems and the nature of mental health impairments, decline need not be "significant" to be meaningful. This general observation also applies specifically here in that it undermines the ALJ's acceptance of Dr. Ondis's limited record review--Dr. Davis specifically found worsening and poorly controlled symptoms in records which were not before Dr. Ondis. (*See*, *e.g.*, R. 453, 464.)  ALJ Riley's conclusion that Dr. Ondis's opinion "is consistent with the medical evidence of record" (R. 26) does not take into account evidence which contradicts some of Dr. Ondis's conclusions.  For example, Dr. Ondis opined that Plaintiff was able to "maintain socially appropriate behavior within reasonable standards and . . . perform personal care functions needed to maintain an acceptable level of personal hygiene" (R. 92), but Dr. Davis noted in April 2013 that Plaintiff's behaviors indicated he was a danger to himself and others, and on more than one occasion Dr. Davis noted that Plaintiff had poor personal hygiene which she attributed to his mental illness in July 2014 (*see*, *e.g.*, R. 436, 454).

For the many reasons set out above, reconsideration of Dr. Davis's records and mental impairment opinion is required upon

remand.  As the foregoing discussion indicates, this entails a

reevaluation of the ALJ's reliance on Dr. Ondis's opinion as well.

## C.    *Credibility Findings*

Plaintiff asserts that the ALJ did not make any credibility

finding regarding Plaintiff's mother's testimony and made an

internally contradictory adverse credibility finding regarding

Plaintiff's testimony.  (Doc. 11 at 17; Doc. 17 at 6.)  Defendant

states that the ALJ summarized Ms. Johnson's testimony which

"merely reiterated statements already found in the record,

including from Plaintiff himself," and, therefore, "'the Court can

reasonably discern that the ALJ also rejected the third-party

complaints for the same reason Plaintiff's complaints were

rejected.'" (Doc. 12 at 26 (quoting *Buckner v. Colvin*, No. 15-175,

2016 WL 1621993, at *16 (M.D. Pa. Mar. 30, 2016)).)  Alternatively,

Defendant argues that, assuming *arguendo*, that the ALJ erred in not

making an express credibility finding regarding Ms. Johnson's

testimony, the error was harmless because the information was

merely cumulative.  (Doc. 12 at 26-27.)  Because remand is required

for the reasons discussed above, Ms. Johnson's credibility should

be specifically addressed.

The Court further concludes that reevaluation of Plaintiff's

credibility is also required.  The Third Circuit Court of Appeals

has stated that "[w]e 'ordinarily defer to an ALJ's credibility

determination because he or she has the opportunity at a hearing to

assess a witness's demeanor.'" *Coleman v. Commissioner of Social Security*, 440 F. App'x 252, 253 (3d Cir. 2012) (not precedential) (quoting *Reefer v. Barnhart*, 326 F.3d 376, 380 (3d Cir. 2003)). "Credibility determinations are the province of the ALJ and should only be disturbed on review if not supported by substantial evidence." *Pysher v. Apfel*, Civ. A. No. 00-1309, 2001 WL 793305, at *3 (E.D. Pa. July 11, 2001) (citing *Van Horn v. Schwieker*, 717 F.2d 871, 873 (3d Cir. 1983)).

Here ordinary deference to the ALJ's credibility finding is diminished from the outset because Plaintiff appeared by telephone due to the difficulty he experienced with travel. (R. 31, 160-61.) As for the internal contradiction in the ALJ's credibility finding alleged by Plaintiff (Doc. 11 at 17), the Court agrees with Plaintiff that his testimony is largely consistent with the litany of symptoms acknowledged by the ALJ ("disorganization, distractibility, emotionally labile, excitability, fidgeting/squirming, frequent careless mistakes, frustration, impulsiveness, inattentiveness, poor memory, poor self-image, panic attacks, difficulty leaving his home, poor performance of daily hygiene, restlessness, short attention span, and excessive talking" (R. 26)).

Further, the reasons provided by the ALJ for discounting Plaintiff's allegations about the limiting effects of his impairments are not supported by substantial evidence. ALJ Riley

identifies three bases for his conclusion that the medical evidence does not support Plaintiff's allegations: 1) Plaintiff "only receives the most routine and conservative care for his conditions"; 2) the medical record reveals that Plaintiff "reported good response from his various medications (Exhibit B2F)"; and 3) his mental status examinations demonstrate that he "generally retains grossly normal functioning." (R. 26.)

The second and third reasons are undermined by the review of evidence set out above: Plaintiff's response to medication varied during the relevant time period and, as discussed previously, the records do not show that he "generally retained grossly normal functioning."[5] As to the care received for his conditions, the ALJ's characterization of Plaintiff's care as "conservative" is questionable given the multiple medications Plaintiff was prescribed to address his mental health problems: as of August 12, 2014, Plaintiff was taking Alprazalom, Buspar, Atenolol, and Lamictal with side effects of dizziness, fatigue and feeling like a zombie.[6] (R. 442.) The ALJ also noted that "the record shows little evidence of any consistent psychiatric care, outpatient

---

[5] Exhibit B2F (R. 253-272), the supporting exhibit cited by ALJ Riley (R. 26), contains records from August 4, 2011, to August 17, 2012. The ALJ determined that the relevant time period began on November 5, 2012. (R. 27.) Therefore, the records cited predate the relevant time period.

[6] These medications are all used to treat mental health problems including anxiety and bipolar disorder. https://drugs.com.

counseling, or even inpatient psychiatric hospitalizations." (R. 25.)  While the ALJ's statement about limited specialized care is true, the record also shows that Dr. Davis recommended additional mental health treatment (*see*, *e.g.*, R. 476) but Plaintiff was not compliant with following up on her recommendations.  Because a "mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment," a credibility determination that does not take this factor into consideration is not entitled to deference.  *Watkins v. Astrue*, 414 F. App'x 894, 896 (8th Cir. 2011) (citing *Pate-Fires v. Astrue*, 564 F.3d 935, 945-47 (8th Cir. 2009)); *see also Kangail*, 454 F.3d at 630; *Sweeney v. Comm'r of Soc. Sec.*, 847 F. Supp. 2d 797, 807 n.14 (W.D. Pa. Mar. 7, 2012).

Finally, the ALJ cites inconsistent information given in the record, the medical reports, and at the hearing as another basis for discounting his credibility. (R. 26.)  ALJ Riley refers specifically to Plaintiff's assertions regarding the frequent need for bathroom breaks due to bowel incontinence and his testimony that he does not have the problem if he remains compliant with his medications.  (*Id.*)  He concludes that this "suggest[s] the claimant's problems are more likely the result of non-compliance with treatment.  Although the inconsistent information provided by the claimant may not be the result of a conscious intention to mislead, the inconsistencies suggest that the information provided by the claimant may not be entirely reliable." (*Id.*)  Because

46

"people with serious psychiatric problems are often incapable of taking prescribed medications consistently," *Martinez v. Astrue*, 630 F. 3d 693, 697 (7th Cir. 2011), an ALJ should consider the effect that the mental health conditions have on a claimant's ability to comply with the medication regimen prescribed.   The ALJ's alleged inconsistency may not exist: Plaintiff's allegations about his bowel problems/ frequent need to use the bathroom and his testimony that the problems are alleviated if he takes his medication may be consistent if Plaintiff frequently does not take the medication.   If this problem is the result of noncompliance with treatment, the fact that mental illness "may prevent the sufferer from taking her prescribed medicines or otherwise submitting to treatment" must be considered.   *Kangail*, 454 F.3d at 630 (citing American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 187, 638 (4th ed. 1994); Frederick K. Goodwin & Kay Redfield Jamison, *Manic-Depressive Illness*, 746-62 (1990)).

The foregoing discussion shows that Plaintiff's credibility must be reexamined upon remand.   This is independently important but also significant in that ALJ Riley found Dr. Schneider's opinion entitled to little weight, concluding his analysis with the statement "[b]ecause it is apparent Dr. Schneider based at least some of these restrictions on the claimant's less-than-credible subjective allegations, the entirety of his opinion is suspect."

(R. 25.)  From this statement it is clear that a different credibility determination would be relevant to the analysis of Dr. Schneider's opinion.

### D. Vocational Expert Hypothetical

Plaintiff also claims error regarding the ALJ's step five determination with his assertion that the ALJ failed to present all of his credibly established limitations in his hypothetical to the vocational expert.  Because the Court has determined that the ALJ erred in his consideration of medical source opinions and credibility, the ALJ's step five determination must also be reevaluated.  Therefore, further discussion of this claimed error is not warranted.

## V. Conclusion

For the reasons discussed above, Plaintiff's appeal is properly granted and this matter is remanded to the Acting Commissioner for further consideration.  An appropriate Order is filed simultaneously with this Memorandum.


S/Richard P. Conaboy
RICHARD P. CONABOY
United States District Judge


DATED: December 2, 2016